[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This is an action by a building contractor to foreclose a mechanic's lien on a modular home that the homeowners claim the plaintiff assembled defectively and unsafely. What began with high hopes on both sides — the plaintiff seeking a modest profit on a business transaction, the defendants aspiring to their "day of dreams come true"[1] — quickly turned sour when the plaintiff began assembling the modular home at the defendants' property. A wall was misaligned, the basement stairs out of place, and the modules could not be laid flush to each other but instead had gaps between them. Although both called in the manufacturer of the modular home for help, the parties fell into dispute. When the defendants refused to pay an invoice, the plaintiff walked off the job, and filed a mechanic's lien on which it now seeks foreclosure. For the reasons stated below, the court finds that the plaintiff may recover on the mechanic's lien but is in turn liable under the defendants' cross-complaint for breach of contract and warranty and for violating the Connecticut Unfair Trade Practices Act and the modular home warranty statute. The court has ordered an additional hearing to address issues raised in this opinion.
Part I of this opinion summarizes the legal proceedings and issues presented here, Part II contains the court's findings of fact, Parts III and IV discuss the court's conclusions on the legal claims and defenses CT Page 4318 raised by the parties, and Part V states the court's resolution of the parties' claims for damages and other relief.
I — NATURE OF PROCEEDINGS
The plaintiff, Carmel Homes, Inc., has brought this action to foreclose a mechanic's lien on certain real property owned by the defendants, Heather and John Bednar (the Bednars). The plaintiff alleges that it sold a modular home and provided related goods and services to the defendants at their property at 166 Westside Road in Woodbury (the property) for a total purchase price of $118,628.18. The complaint further alleges that the plaintiff substantially performed all requirements under a written contract between the parties, that the defendants failed to pay for the work performed under that contract, and that the plaintiff filed a timely mechanic's lien on the defendants' property for the amount owed.
The defendants admit that they entered into a contract with the plaintiff to purchase a modular home, and that the plaintiff delivered the modular home and began providing various materials and services related to the contract. They assert, however, that the plaintiff defectively and unsafely assembled the modular home and then abandoned the job before payment was due and without substantially fulfilling the contract between them. The defendants have filed an answer, special defenses and cross-complaint alleging breach of contract and violations of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes §42-110a et seq., and the statutory manufacturer's warranty required for modular homes pursuant to General Statutes § 21-86.
In a non-jury trial before this court held on divers days during January and February 2000, the plaintiff and the defendants both offered testimony and submitted various exhibits. Thereafter, the court received briefs and heard argument from counsel on the factual and legal issues presented here for decision. After due consideration of the issues presented through the totality of the evidence, including the testimony of the multiple witnesses and the submission of the numerous exhibits, and having reflected upon the parties' oral and written legal arguments, the court hereby makes the following findings of fact and conclusions of law.
II — PRELIMINARY FINDINGS OF FACT[2],[3]
1. On June 19, 1998, Michael Carlson, the owner of Carmel Homes, Inc., and John and Heather Bednar entered into a contract for the purchase of a modular home. They signed a "Purchase Agreement," which provided that Carmel Homes would "sell, deliver and erect" a new four-unit modular home manufactured by Premier Builders, Inc. (the manufacturer) for a total CT Page 4319 price of $92,354.60. The purchase agreement stated that payment would be due in four installments:
• An immediate deposit of $1,500;
 • A second payment of $13,853.20 "upon releasing house for Production";
 • A third payment of $76,501.40 "[d]ue and payable on the day the house is set on the foundation and made weather tight, i.e., the roof covered and the gable end sheathing in place"; and
 • A "[f]inal payment" of $500 "upon completion and Certificate of Occupancy."
(Pl.'s Ex. 2.)
2. The purchase agreement referred to and incorporated a separate "Standard Specifications and Options Sheet" that specified the standard items included on the modular home and listed additional options. After the defendants selected certain of those options, both parties that day also signed this form. (Pl.'s Ex. 9.)
3. The purchase agreement only applied to manufacture and erection of the modular home, with the options selected by the defendants and incorporated here in plaintiff's exhibit nine. Before a modular home can receive a certificate of occupancy permitting home owners to live in the modular home, additional work not covered by the purchase agreement is necessary: a foundation for the home must be excavated and poured, prior to setting of the modular home; electricity brought to the premises and connected to the modular home; a heating system purchased, installed, and connected to the modular home; a septic system built, a well dug, and both connected to the house plumbing connections, or the house attached to public sewers and water; and miscellaneous other site work done that is not covered under the purchase agreement. The plaintiff has no standard practice regarding who performs this additional site work. Whether the plaintiff does all of this additional work (referred to here in plaintiff's exhibits eight and ten) is solely up to the customer. In some contracts, a customer contracts for the plaintiff to do all of the site work; in other contracts, a customer may decide to do all the site work itself or have it done by other contractors the customer independently selects; in yet other contracts, the customer decides, as the defendants did here, to hire the plaintiff for some of the site work and to do, or have others it hires independently do, the remainder of the site work. CT Page 4320
4. The purchase agreement provided that "[a]ny additionally signed Proposals pertaining to this project shall and will become part of this agreement in its entirety." That same day Carlson and the Bednars also signed two such "proposals" that described various other related goods and services the plaintiff would provide.
a. The first of these signed proposals specified who would undertake various "site work" jobs. The parties agreed that Carmel Homes would, for an additional $17,450, pour foundation walls and floors for the house and for a garage that the defendants would themselves build later, connect the plumbing in the house and to the well and septic system, and hook up electricity "within the house plus the meter box." The agreement listed a separate price for each of these tasks. The agreement specified that "Other than Carmel Homes" would do site work excavation, design the septic system, and install the water systems. (Pl.'s Ex. 10.)
b. A second written "Proposal" signed that day provided that the plaintiff would provide, install, and connect an oil-fired hot water boiler and heating system for a total price of $5,350. (Pl.'s Ex. 8.)
c. Another written "Proposal" signed that day specified the separate prices for the modular home, the additional options added, the site work, the hot water heating system, and the total purchase price of $115,154.60. (Pl.'s Ex. 14.) The three written "Proposals" each specified that payment under them would be required pursuant to a "construction disbursement schedule" (although no document entitled thus was introduced into evidence, the court concludes, from all the evidence, that the schedule of payments specified in the purchase agreement, plaintiff's exhibit two, contained that schedule).
5. The parties signed these separate documents at the same time and regarded them as one agreement.
6. That same day, the defendants signed a floor plan acceptance and a release for production authorizing the manufacturer to begin construction of the modular home.
7. Although the purchase agreement provided for two installment payments of $15,353.20 before construction of the modules and specified that "time was of the essence" in payment, the plaintiff accepted an $8,000 deposit and ordered the modular home from the factory without payment of the full $15,353.20.
8. Shortly after they signed the three agreements on June 18, the defendants contacted the plaintiff, informed Carlson that they were CT Page 4321 having difficulty selling their current home and asked to cancel the contract. The defendants and the plaintiff agreed that the plaintiff would hold the $8,000 payment and apply it against a possible resumption of their agreement.
9. The defendants later contacted the plaintiff and both parties agreed to resume their deal. On September 30, 1998, the parties signed a "Change Order" correcting and modifying some of the selections on the original Specifications and Options Sheet and adding $3,473.58 to the price, for a new total of $118,628.18. The first numbered item on the Change Order stated "1 — Clarification on House Finish, Owner to finish and complete the inside of the House." (Pl.'s Ex. 13.)
10. The parties orally agreed later that the plaintiff would purchase and install lolly columns for an additional charge to the defendants of three hundred dollars.
11. On October 13, 1998, the four modules that would comprise the defendants' home were delivered to the property on steel metal frames left on the site. Two days later, on October 15, the plaintiff's work crew used a crane to lift them off the transporter frames and place them one by one on the foundation that the plaintiff had earlier built. The crane first set the two bottom modules, identified as the "A" and "B" "boxes," directly on the foundation walls, one at a time. The work crew toenailed the base of the A and B boxes to a wood sill plate bolted to the perimeter of the foundation; they also bolted the center of the two boxes together in the basement at their base. The plaintiff's work crew then used the crane to stack the C and D boxes atop the A and B boxes, one at a time. The plaintiff affixed the base of the C and D modules by nailing them to the lower boxes around their perimeter and bolted them together where the centers of the two top boxes met in the attic.
12. The plaintiff typically, in assembling a two-story four-unit modular home, attaches the two bottom boxes of a four-module home together by bolting or nailing them together where they join "at the top of the bottom boxes" to secure them to each other. (Test. 1/4/00 at 19.) In this instance the plaintiff did not do so at the time of the original installation.
13. The manufacturer has prepared a written set-up manual that is a basic guideline to setting and installing modular homes in compliance with the Council of American Building Officials (CABO) building code that Connecticut has adopted as part of its residential building code. Industry custom does not require a builder to follow the set-up manual, as there may be other acceptable ways to accomplish a particular task. The set-up manual in this instance directs builders to attach the A-unit CT Page 4322 first floor ceiling joist to the B-unit first floor ceiling joist with 10d nails every six inches.
14. By the end of the first day of assembling the modular home, Carlson and the Bednars noticed several problems with the house:
a. The factory-installed siding was not set in a proper position for the double sill plate that the defendants had ordered for the purpose of adding an extra one and a half inches of height in the basement.
b. The factory had not installed the wind barrier around the house that the defendants had ordered.
c. The header wall of the cellar stairs was located improperly.
d. An exterior gable-end wall of one of the lower modules (the B box) was not completely perpendicular to the foundation or aligned flush with the wall of the box directly above it.
e. There was a gap between the boxes where they met that ran from the basement to the attic. In some places in the attic, this gap was approximately 1 1/2 inches wide.
f. Some of the interior sheet rock was damaged from having become wet.
g. A bathtub in one of the bathrooms was stained and needed to be replaced.
h. Certain kitchen ceiling lights were installed in the wrong location. Carlson and the defendants each called the manufacturer and it agreed to send a work crew to repair these problems.[4]
15. A builder of modular homes should always attempt to prevent, eliminate, or minimize any gap between adjoining modules. A gap of more than one-eighth inch between modules is a building code violation and a fire safety hazard that could become a chase allowing fire to spread from one part of the house to another. Proper and safe building of a modular home requires that gaps of more than one-eighth inch be filled with suitable fire stopping material. It is much easier to eliminate or fire stop gaps during the installation process rather than afterwards, when walls, floors, or ceilings may need to be opened.
16. By placing the C and D boxes on top of the A and B boxes without fire-stopping or eliminating the gaps between the lower modules, the plaintiff assembled the components in such a manner as to obscure the gaps between the A and B modules and the lack of fire stopping. By the end of CT Page 4323 the first day of installation, however, the defendants had discovered that there was a gap between both the A and B modules and between the C and D modules. The defendants knew then that it was possible to see through the gap all the way from the basement to the attic or from the attic to the basement.
17. When the manufacturer ships the modules, the roof portions are hinged and a portion laid back so that the roof can lay down flat for shipping. As a result, certain parts of the roof are shipped unshingled because of the hinges. By the end of Friday, October 16, the plaintiff had raised and finished shingling the roof, installed a roof cap, and put the gable end sheathing in place.
18. On Monday, October 19, subcontractors Carmel Homes had hired were at the property: a siding contractor had started the process of removing the siding and installing the wind barrier; a plumber was doing plumbing connections between the floors, and an electrician was hanging the electrical panel box in the basement.[5]
19. A two-person work crew sent by the manufacturer arrived at the property on Tuesday. October 20, to begin work on the problems that the plaintiff and the defendants had reported to it.
20. The defendants complained to the manufacturer about the gap between the A and B boxes and between the C and D boxes.
21. On October 21, Carlson presented defendant Heather Bednar with an invoice seeking payment of $98,453.18 "for the work done to date." (Test. 1/4/00 at 73.) The invoice delineated that amount as due for the following items:
 $84,354.60 Payment after House is set weather tight 3,473.58 Payment for change order. . . . dated 9-30-98 300.00 Payment for lolly columns and plates verbally ordered 13,325.00 Payment for concrete foundation, house garage (3,000.00) Credit for concrete flooring not done to this date $98,453.18
22. After the defendant Heather Bednar refused to pay the amount requested by Carlson, he left the work site, conferred with an attorney, and returned the next day, October 22, when he repeated his request for payment. Ms. Bednar again refused to pay. At least one, and probably both, of these conversations between Carlson and Ms. Bednar were very heated, with both parties raising their voices and using profanity. After Ms. Bednar again refused to pay on the twenty-second, Carlson instructed the plaintiff's work crews to leave the work site, which they all did. CT Page 4324 The manufacturer's work crew stayed at the property working on the various problems.
23. By the time the plaintiff walked off the job, the work crews hired directly by the plaintiff had — in addition to placing the four modules on the foundation, raising and shingling the roof, and putting the gable end sheathing put in place — accomplished and left undone the following work called for under the written agreements between the parties:[6]
a. The siding contractor had removed the siding, installed wind barrier and reinstalled siding on the back side of the house, and begun installing the wind barrier on one of the gable sides of the house. The siding contractor did not complete installation of the wind barrier, siding, or the soffit and fascia, all items that the purchase agreement required the plaintiff to provide and install.
b. The electrician had installed the electricity panel box, installed the meter and all wires going to it, and the builder inspector had accepted that work. The electrician did not complete the basement and attic lights or wiring the boiler and water tank.
c. The plumber had connected the plumbing between the first and second floors and one-quarter of the basement plumbing. The plumber did not purchase or install a boiler, oil tank, power vent, hook all those up, or finish hooking up the water, hot water, cold water and PVC drains.
d. The plaintiff never poured the cement floors for the house foundation or garage as called for in the site work agreement.
24. By the time the plaintiff walked off the job on October 22, the manufacturer's work crew had already rectified the problem of the misaligned B box wall by moving the wall over to make it align more plumb and then re-fastening it in proper position.
25. When Carlson left the work site, he reasonably expected that the manufacturer would rectify the problems that the defendants and he had identified to the manufacturer.
26. On October 30, 1998, the defendants, through counsel, sent a letter to the plaintiff's attorney claiming that the modular home had been improperly and negligently assembled and informing the plaintiff "that any entry onto the property" without their permission would be "met with criminal charges for trespassing and, if applicable, conversion."
27. The manufacturer's work crew remained at the property from October CT Page 4325 26 to October 30, 1998, and returned again from November 2 to November 4, 1998. By the end of this time, the manufacturer's work crew had done the following, at no additional charge to the Bednars:
a. Tightened the top two boxes closer together, using a contraption called a "come along."
b. Placed adequate fire-stopping in the remaining gap between the C and D boxes in the attic.
c. Placed adequate fire stopping in the gap between the A and B boxes in the basement.
d. Rectified the problem of the improperly positioned basement stairwell by moving a wall and header.
e. Installed all of the wind barrier.[7]
f. Reinstalled some but not all of the siding ordered by the Bednars.
g. Removed and replaced the improperly-placed siding near the double sill plate.
h. Corrected the marred bathtub.
i. Installed additional kitchen ceiling lights in the originally-intended positions.
j. Installed new sheet rock where the walls had become wet during manufacture, transportation, or assembly.
28. After the plaintiff walked off the job on October 22, the defendants themselves did the following to make the home livable and to complete the work the plaintiff had originally contracted to do:
a. They finished the interior of the modular home, as called for under the purchase agreement.
b. They installed the interior strapping doorways between marriage walls (with the assistance of the manufacturer's work crew).
c. They spent $6,200 for a plumber who finished connecting all the plumbing and installing the heating system.
d. They spent $1,400 to a siding contractor to complete the siding. CT Page 4326
e. They paid $221 to an electrician to complete the electrical work and $150.98 to fix faulty wiring in a chandelier.
f. They paid a mason $133.56 to install four basement windows.
g. They spent $1,720.53 for concrete materials for the house and basement foundation floors and paid a contractor $990 to pour those floors.
h. They incurred a charge of $3,465 from Ms. Bednar's brother to install a chimney instead of a power vent that the defendants had ordered but was not delivered with the house.[8]
29. The purchase agreement called for the defendants to complete the interior finish of the house. If the plaintiff had finished assembling the modular home and completed all of its work under the three contracts, the defendants would have had to spend up to two weeks doing the finish work. Because the plaintiff did not complete the contracts, it took the defendants an additional thirty days to do the finish work and that outlined in the paragraph above. John Bednar took off from work for that time and lost wages of $4,680 for the extra thirty days of work.
30. On December 18, 1998, following the completion of the above work by the manufacturer and the defendants, the town building inspector issued a certificate of occupancy for the property.
31. In January 1999, the defendants submitted a written service request form to the manufacturer, on a preprinted Premier Builders form, requesting removal of stains on certain carpets; installation of roof vents and pipes and bathroom receptacles; moving a deck switch; redoing certain stained dry walls; repairing damaged window sills; and repairing scratched doors. On February 22 through 24, 1999, a manufacturer's work crew came to the defendants' property and completed all this work to the defendants' satisfaction, at no additional cost to them.
32. After trial commenced here, the defendants discovered that was still a gap greater than one-eighth of an inch between the marriage walls of the A and B modules at the ceiling level that was not filled with fire stopping material. They also discovered that there were no nails or bolts joining these two lower modules together at the ceiling level.
33. After the close of testimony, the manufacturer nailed the marriage walls of two lower boxes together at the ceiling level and installed fire stopping in the gap.
34. The manufacturer provided to the defendants a limited one-year CT Page 4327 written warranty that the modular units it manufactured would be free from any major construction defects. The defendants signed a written copy of that warranty on September 30, 1998, acknowledging that they had read and understood it.
35. The purchase price for the house included a $100 fee that extended the manufacturer's one-year limited warranty for an additional nine years.
36. At the time of selling the modular home, the plaintiff did not provide to the defendants a written warranty that complied in all respects with the requirements of General Statutes § 21-86. On July 8, 1999, after litigation had commenced here, the plaintiff provided a warranty complying with § 21-86.
37. On October 22, 1998, the plaintiff filed and recorded a mechanic's lien on the land records of the town of Woodbury for $98,453.18 on the property to secure the "value of goods and services" it "furnished . . . in the erection of a certain modular home" on that property beginning on October 13, 1998, and ceasing on October 21, 1998. (Pl.'s Ex. 1A.)
38. On January 20, 1999, the plaintiff filed and recorded on the land records of the town of Woodbury a second mechanic's lien for $110,628.18 on the property to secure "the value of materials and services" it furnished in "the erection of a certain modular home" on that property beginning on October 13, 1998, and ceasing on October 21, 1998. On January 20, 2000, the plaintiff filed a release of this second lien on those same land records. (Pl.'s Ex 1.)
39. From the testimony of James Athor, a certified appraiser licensed in the State of Connecticut, and his written report (Pl.'s Ex. 24), the court finds that the defendants' modular home is located on thirteen acres, and the fair market value of the land as of the time of trial was $146,450. The fair market value of the improvements on the land, as of the time of trial, was $147,460.[9] The total fair market value of land and improvements was $293,910.
 III — THE PLAINTIFF'S CLAIM FOR RECOVERY ON A MECHANIC'S LIEN
The plaintiff's revised one-count complaint claims that it may recover on the mechanic's lien because it substantially performed the work it contracted for. The defendants' brief argues that partial performance of a building contract does not support foreclosure of a mechanic's lien, but as the plaintiff relies exclusively on a claim of substantial performance, the court need only consider whether the extent of the completed work here rises to the level of substantial performance. In CT Page 4328 response, the defendants claim that the plaintiff did not substantially complete the work and may not recover on a mechanic's lien, even for substantial performance, because the plaintiff was wholly or partially at fault for the failure to completely perform. The defendants also assert various special defenses. They claim that the second mechanic's lien filed by the plaintiff encumbered their property in excess of the amount rightfully owed. They assert that the liquidated damages clause of the contract is unenforceable. They also allege breach of contract and warranty; non-compliance with the building code; and CUTPA violations for attempting to hide a dangerous fire hazard and violating statutory warranty requirements. The court will address these issues in turn.
A. Contractor fault does not preclude recovery on a mechanic's lien.
The defendants claim that the plaintiff may not recover on the mechanic's lien, even for substantial performance, because, they assert, the plaintiff was "wholly or partially at fault for the failure to completely perform." (Defs.' Post Trial Brief at 3, citing Daly Sonsv. New Haven Hotel Co., 91 Conn. 280, 99 A. 853 (1917).) Although the court did hold in Daly that "[i]t is one of the conditions of a contractor's right to recover as for substantial performance, that his default was not wilful or voluntary"; Daly Sons v. New Haven HotelCo., supra, 290; our Supreme Court, relying on more modern authority, has since abandoned that view.
In Vincenzi v. Cerro, 186 Conn. 612, 442 A.2d 1352 (1982), the defendant claimed, on appeal of a verdict awarding damages for substantial performance of a building contract, that
 the doctrine of substantial performance was inapplicable . . . because the plaintiff's were guilty of a wilful or intentional breach of contract by failing to complete all of the work required. . . . [A] builder who has failed to complete his contract fully may not invoke its benefit unless he was prevented from doing so by some circumstance beyond his control, such as interference by the owner.
Id., 615. Acknowledging its earlier precedent, the Supreme Court, however, upheld the trial court's decision:
 The contemporary view, however, is that even a conscious and intentional departure from the contract specifications will not necessarily defeat recovery, but may be considered as one of the several factors involved in deciding whether there has been full CT Page 4329 performance. 3A Corbin, Contracts § 707; 2 Restatement (Second), Contracts § 237, comment d. The pertinent inquiry is not simply whether the breach was "wilful" but whether the behavior of the party in default "comports with standards of good faith and fair dealing." 2 Restatement (Second), Contracts § 241(e), and see comment f. Even an adverse conclusion on this point is not decisive but is to be weighed with other factors, such as the extent to which the owner will be deprived of a reasonably expected benefit and the extent to which the builder may suffer forfeiture, in deciding whether there has been substantial performance.
Id., 615-16. Under this rule, fault on the plaintiff's part in not completing the contracted work does not preclude recovery, but the court must consider any such fault or lack of good faith or fair dealing in determining the question of substantial performance.
The court finds that although the plaintiff's actions precipitated the breakdown that led to his walking off the job, both parties here were at fault and bear responsibility for the fact that the plaintiff did not fully complete the contracted work. The plaintiff is initially at fault because Carlson's demands for payment on October 21 and 22 were premature. Under the purchase agreement, the sums of $84,354.60 for the initial order on June 18 and the additional amount of $3,473.58 for the September 30 change order were not due until "the day the house is set on the foundation and made weather tight, i.e., the roof covered and the gable end sheathing in place." Although there is dispute between the parties as to whether the house was "weather tight" as of October 21, the evidence offered by both sides establishes without doubt that the house was not yet fully "set."[10] Thus, Carlson's demands for payment that day and the next were premature, and the defendants were justified in refusing to pay.
According to Carlson, when Heather Bednar refused to pay, she told Carlson that she had paid for and expected him to provide a "perfect house" and "she wasn't paying for it until it was perfect." (Test. 1/4/00 at 74.) The plaintiff testified that, as a result: "I got nervous since I'm already behind the eight ball because I didn't get paid the correct amount in the first place. I feared I would never get anything on this." Id. Ms. Bednar testified, however, that she "told him that I would not pay until the house was safe." (Test. 2/8/00 at 47.) The court could not determine who to believe on this point. Either account was plausible and consistent with other evidence and with the conduct of the parties before and afterwards. No independent or objective evidence supports either CT Page 4330 party's version of that aspect of their discussion.[11]
Since the court does not find the plaintiff's evidence about this exchange any more convincing than the defendant's, the plaintiff has not sustained the burden of proof it carries to persuade the court that its version is the accurate one. The court can only determine that when the plaintiff prematurely claimed payment and the defendant demanded either perfection or proof of safety, tempers flared, both used profanity, and the plaintiff walked off the job. Although Carlson's request for payment precipitated this brouhaha, the intemperateness of the defendant's response inflamed it. Had either been more moderate in the views they stated or the manner in which they expressed those views, the work might have continued. The court thus finds both at fault for the breach, although the plaintiff more so because his premature demand for payment instigated the dispute. Yet whether the plaintiff was partially or completely at fault for its failure to perform the contract completely, such fault does not preclude a recovery for substantial performance.
B. The court may measure whether the plaintiff substantially performed under the agreements separately.
The critical issue, in determining whether the plaintiff may recover for substantial performance, is whether the court must measure the plaintiff's performance against all the requirements of the three agreements that the parties entered into here, or whether the agreements represented by exhibits two, eight and ten (the purchase agreement and the two signed proposals for other site work and a heating system) were severable, divisible agreements that the court should consider separately in determining the question of substantial performance.[12]
In determining whether these agreements are severable, the court must construe the language of the contract and the intent of the parties in terms of various factors.
 [I]t is the general rule that a severable contract is one in its nature and purpose susceptible of division and apportionment. . . . The determinative test is in ascertaining from the language used, read in the light of the surrounding circumstances, what was the intention of the parties. . . . In determining the severability of the contract, the court looks to whether the contract's parts and its consideration are common to each other or independent of one another. . . . ([S]ingleness or apportionability of the consideration rendered is a principal test in judging severability.)
CT Page 4331
(Brackets in original; citations omitted; internal quotation marks omitted.) Venture Partners, Ltd v. Synapse Technologies, Inc.,42 Conn. App. 109, 118, 679 A.2d 372 (1996).
Similarly, in Kunian v. Development Corporation of America,165 Conn. 300, 334 A.2d 427 (1973), the court noted that "[a] contract is divisible where by its terms, 1, performance of each party is divided into two or more parts, and, 2, the number of parts due from each party is the same, and, 3, the performance of each part by one party is the agreed exchange for a corresponding part by the other party. "Id., 309-10, citing Restatement, 1 Contracts § 266, p. 385. Thus, the court held there that an installment contract for the purchase and delivery of plumbing supplies and payments on the tenth and twenty-fifth days of each month was divisible "because the performance of each party clearly was divided into parts and the performance of the plaintiff was the agreed exchange for the performance of the defendant on the 10th and the 25th of each month." Id., 311.
The courts have also noted that although the divisibility or severability of a contract turns on the intent of the parties, the court must, in determining their intention, look to "the language used by them interpreted in the light of the situation of the parties and the circumstances connected with the transaction." Id., 310. "[I]f the terms of an instrument are fairly susceptible of two or more interpretations, the one which is the more equitable, reasonable and rational is to be preferred." Texaco, Inc. v. Rogow, 150 Conn. 401, 408, 190 A.2d 48
(1963). On the other hand, if the contract is ambiguous, it must be construed in a consumer transaction such as this purchase of the home against the plaintiff, who drafted it.
The defendants' make three arguments why the agreements here are not divisible. First, they correctly point out that no language in the agreements specifies an intent to make them severable. As Professor Corbin notes, however, "in most of the cases where the matter is in litigation, the parties had no "intention [regarding divisibility of their agreement] and none can be found by an honest process of interpretation of their expressions." 3A A. Corbin (1960), Contracts § 694, p. 283; see also 2 Restatement (Second), Contracts § 240, comment (e) (1981) ("[t]he parties may, by express provision, determine either that it is or is not proper so to regard them. But they do not often do this, and, because separate pairs of corresponding parts are not the subjects of separate bargains. . . . the parties usually cannot even be said to have had any actual intention on the point."). Thus, the absence of contractual language specifying that the agreements were intended to be divisible is neither unusual nor a bar to their being CT Page 4332 such.
The defendants also point to language in the purchase agreement that "additional work to be done will be addressed on the other proposal forms and then will become part of this purchase agreement." They emphasize that Carlson on cross-examination admitted that "you were looking at this as one agreement as opposed to ten or fifteen separate agreements." (Tr. of 1/5/00 at 109.) As the Restatement points out, however, the rules on divisibility of a contract arise only when the parties intended a single contract. If there were separate contracts, then a party's failure to perform on one contract would have no effect on the duty of the other to perform under a separate contract; the performance under each is necessarily separate and there is no need to inquire about divisibility.[13] Hence, the parties' intention to have a single contract here does preclude divisibility of the agreements.
Finally, the defendants urge that the performance intended under the agreements here was "a single, indivisible object" (Defs.' Mem. of Law at 2) — purchase and delivery of a modular home complete in all but minor respects. In support of this claim, they cite Bridgeport v. ScottCo., Inc., 94 Conn. 461, 109 A. 162 (1920), where a sea wall the defendant contracted to build was destroyed by a storm before completion. The contract there called for construction of a masonry wall, placing large quantities of riprap on the seaward side of the wall, filling in behind it, the driving of piles, and the use of both plain and reinforced concrete. The consideration named in the contract was based on specified unit prices for the various kinds of work involved, such as for each cubic yard of excavation, each cubic yard of fill, each cubic yard of cement masonry, etc. Payment was due in installments based on value of the labor performed and materials used. Though each component of the wall was separately priced according to the quantity of work performed, the court held the contract was not severable:
 [T]he intent of the parties was on the contractor's part to construct a sea-wall of a specified length, complete in all details thought necessary to make it serve as a suitable and serviceable barrier against the encroachments of the sea, and . . . the resultant was to be a sea-wall and not constituent masonry, riprap, fill, concrete, piles, etc. . . . [T]he right to receive payment was conditioned upon the completion of the wall in its entirety."
Id., 467-68.
The language of the sea wall case harkens back to two of the CT Page 4333 traditional tests sometimes referred to in assessing whether an agreement is divisible: "divisibility of subject matter"[14] and "apportionment of consideration."[15] 17a C.J.S. 391-392, Contracts §§ 351 and 352 (1999). Legal authorities have traditionally stated, as the Appellate Court noted in Venture Partners, that determining whether a contract is divisible turns upon the intent of the parties, as revealed by the language of their agreement, a test that does not usually resolve the question. As the court observed in Bridgeport v. Scott Co., however, "[i]t is not always an easy matter to determine just what contracts are severable and what are not"; (Citation omitted.) 94 Conn. 465; a point on which other courts and commentators agree. Professor Corbin has lucidly criticized the traditional test of whether a contract is "entire" or "divisible" as employing "terms of confusion" that are "no more than attempts to describe a result already reached." 3 A. Corbin, Contracts, § 694, pp. 277, 281 (1960 Supp. 1999).[16] The courts have instead come to view, as the court stated in Bridgeport v. Scott Co.,
supra, the "singleness or apportionability of the consideration" as "the principal test" of divisibility. 94 Conn. 466.
The Restatement (Second) of Contracts has significantly advanced the analysis of whether an agreement is severable or divisible in its discussion of apportioning performance and consideration. The Restatement does so in various ways. First, it abandons use of the terminology "entire," "divisible" or "severable" that has proven so vexing.[17]
Second, it focuses the inquiry on the nature of the performance and consideration in the transaction between the parties. The Restatement terminology, "part performances as agreed equivalents," proposes specific criteria for when performance and consideration can be apportioned:
 If the performances to be exchanged under an exchange of promises can be apportioned into corresponding pairs of part performances so that the parts of each pair are properly regarded as agreed equivalents, a party's performance of his part of such a pair has the same effect on the other's duties to render performance of the agreed equivalent as it would have if only that pair of performances had been promised.
2 Restatement(Second), Contracts § 240, p. 229 (1981).
The Restatement thus establishes two criteria for a divisible contract: (1) "apportionment" — the parties' performances can be apportioned into corresponding pairs of part performances; and (2) "agreed equivalents" — the parts of each pair of performances are agreed equivalents. While the former is CT Page 4334 often easily discerned — "The process of apportionment is essentially one of calculation . . . It is enough, however, if the price of separate items is separately stated in the agreement itself; Id., comment (d); the latter is frequently more difficult to resolve and involves assessing the essence of the agreement and the mutual performances obligated thereunder:
 Whether it is proper to regard the parts of each pair as agreed equivalents will usually depend on considerations of fairness, similar to those that guide a court in deciding whether to supply a term. . . . The standard under this Section, like that of materiality. . . . is necessarily a somewhat imprecise and flexible one. It requires that the parts of a pair be of roughly equivalent value to the injured party in terms of his expectation with respect to the total agreed exchange. This is because fairness requires that a party, having received only a fraction of the performance that he expected under a contract, not be asked to pay an identical fraction of the price that he originally promised on the expectation of full performance, unless it appears that the performance that he actually received is worth to him roughly that same fraction of what full performance would have been worth to him. . . . The injured party will not be required to pay for a part of the performance that he has received if he cannot make full use of that part without the remainder of the performance. . . . In deciding whether the injured party can make full use of only part, a court must, of course, take account of the possibility that the remainder of the performance can be easily obtained from some other source, as, for example, where the attachment is available on the market.
Id., comment (e).
Applying these tests to the facts presented in the instant case, the court concludes that the agreements here are severable. The agreements here easily fit the first Restatement criterion: the performances to be exchanged between Premier Homes and the Bednars are apportionable into corresponding pairs of part performances. Each agreement contained an exchange of promises with its own corresponding price. The purchase agreement set a specific price for the purchase, delivery, and assembly of a modular house with certain options (the purchase agreement as CT Page 4335 supplemented by the standard options and specifications sheet, and as amended by the September 30 change order). A second agreement, denoted "Site Work Proposal," specified a series of tasks, some to be undertaken by the plaintiff and some assumed by the defendants, and those that the plaintiff contracted to perform had individual prices appropriately corresponding to the particular task. (Pl.'s Ex. 10.) The third agreement provided that the plaintiff would provide, install, and connect an oil-fired hot water boiler and heating system for a total price of $5,350. (Pl.'s Ex. 8.) As Farnsworth points out, "[t]he requirement that apportionment be possible is met if the price for parts of the performance can be determined. It is enough if the agreement states separate prices for different parts of the work. . . ." E. Farnsworth, supra, § 8.13, p. 597.
The duties imposed on the plaintiff under each agreement and the consideration it would receive in return were independent of the duties and consideration under the other agreements. As Carlson explained, when the plaintiff sold a modular home, it could transport and assemble the modules and do nothing else; it could transport and assemble the modules and deliver the home in turn-key condition; or, in addition to transporting and assembling the modular home, it could perform part of the remaining services necessary for turn-key condition. (Test. 1/4/00 at 24-25.) The site work and hot water heating contract contained the parties' agreements as to who would be responsible for those remaining tasks after delivery and assembly. The contractual language shows a mutual intention to divide the performance of each party into separate parts, including construction and assembly of the modular home and certain site work performed both before (pouring the garage and basement foundations) and after the modular home was set on the foundation (plumbing, electrical and heating connections and installing a hot water heating system). Under the site work contract, the plaintiff was not even responsible for certain of the tasks necessary before or after assembly of the modular home, such as excavation of the foundation. The fact that the defendants assumed responsibility for certain of the work outlined in the Site Work Proposal bolsters the finding of apportionment.
The three written agreements here also meet the test of agreed equivalents. The consideration the plaintiff would receive was apportioned according to the goods and services it provided. Each contract had a separate price that matched the number of tasks undertaken by the plaintiff with the same number of elements of consideration being paid by the defendants. Each party's partial performance was the "agreed exchange" for corresponding performance by the other part; delivery and assembly of the modular home for one price; separate charges under the site work agreement for each of the obligations the plaintiff assumed under it; and a separate charge for the hot water heating system CT Page 4336 proposal. The promises contained in each — what Carmel Homes would provide and the Bednars would pay — were comparable in value; otherwise, the defendants would have contracted elsewhere for the site work and heating system.
Applying the considerations of fairness that comment (e) to the Restatement observes often underlie the analysis of agreed equivalents, this court concludes that what the defendants would pay under each agreement represented a roughly equivalent value to them of the performance the plaintiff would perform under that agreement. InBridgeport v. Scott Co., supra, 94 Conn. 461, on the other hand, the town could not make full use of the portion of the contract partially performed without the remainder of the performance; an incomplete sea wall offered no protection against the ocean and was useless for its intended purposes until completed.[18] The by the plaintiff — taking into account, as comment (e) to the Restatement notes, the relative ease with which they obtained the remainder of the work from other sources. Thus, the court will consider each of the three agreements separately in determining the question of substantial performance. None of the objections offered by the defendants to treating the agreements separately compel an opposite conclusion.
C. The plaintiff substantially completed the work required under the purchase agreement.
The determination of whether a building contract has been substantially performed is a question of fact for this court to determine. Argentinisv. Gould, 23 Conn. App. 9, 14, 579 A.2d 1078 (1990), aff'd in part' rev'd in part on other grounds, 219 Conn. 151, 592 A.2d 378 (1991). "The analysis necessarily involves an inquiry into the totality of facts and circumstances surrounding the performance of the contract." Miller v.Bourgoin, 28 Conn. App. 491, 496, 613 A.2d 292, cert. denied,223 Conn. 927, 614 A.2d 820 (1992). The traditional explication of the test of substantial performance was that it "contemplates the performance of all items of a building contract except for minor details, those easily remedied by minor expenditures." Argentinis v. Gould, supra,23 Conn. App. 14, citing Rosnick v. Aetna Sheet Metal Works, Inc.,146 Conn. 565, 568, 153 A.2d 435 (1959). More modern authorities set out a variety of factors for the court to consider, including the extent to which the injured party will be deprived of the benefit reasonably expected, the extent to which that party can be adequately compensated for the deficiency of performance, the extent to which the performing party will suffer forfeiture, the likelihood that the performing party will cure his failure in light of the circumstances and his reasonable assurances, and the extent of good faith and fair dealing on the part of the performing party. See 2 Restatement (Second), supra, § 237 CT Page 4337 comment (d), and 2 Restatement (Second), supra, § 241;[19] see alsoVincenzi v. Cerro, supra, 186 Conn. 616.
The defendants claim that the plaintiff did not substantially perform the work contracted for.[20] To evaluate that claim, the court must consider each of the defendants' complaints. Some of the defendants' complaints about partial performance concern work contracted for under the other agreements and do not affect the question of whether the plaintiff substantially performed its obligations under the purchase agreement.[21] The court concludes that other of the items complained about do not affect the question of substantial performance.[22]
Thus, the court must consider whether the following uncompleted work precludes a finding of substantial performance:
 • Gaps between the C and D modules in the attic that the manufacturer reduced and fire stopped without cost to the defendants in November 1998;
 • Gaps between the A and B modules in the ceiling that the manufacturer fire stopped after the close of evidence in this case;
 • Attaching the A and B modules together at the ceiling level, a task the manufacturer completed after the close of evidence;
 • Fire stopping and wind barrier that the manufacturer installed without cost to the defendants;
 • The partial installation of siding by the manufacturer that the defendants had to hire a contractor to complete; and
• The defendants' purchase of additional siding.
The court finds that these factors do not preclude a finding of substantial performance. These tasks involved very minimal financial cost to the defendants — only $1,400 for the siding installation. In terms of the Restatement factors, the plaintiffs leaving these tasks undone did not deprive the defendants of the benefit they had reasonably expected, a new home. An award of damages can compensate the defendants for any deficiencies in the plaintiff's performance. Not finding substantial performance would work an unfair and substantial forfeiture to the plaintiff by depriving him of recovery for the work performed. As CT Page 4338 the court held in Vincenzi v. Cerro, supra, 186 Conn. 617, with a contract price of $92,198.18 for the work to be performed under the purchase agreement, "the proportion of unperformed work, therefore, was so minimal as to warrant the conclusion of substantial performance. . . ."[23]
Thus, the primary factor weighing against a finding of substantial performance is the question of good faith. Among the factors for determining whether a failure to perform contractual obligations is material (so that there is a failure of substantial performance), comment (f) to § 241 of the Restatement (Second) of Contracts includes the extent of good faith and fair dealing on the part of the performing party:
 The extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing is, however, a significant circumstance in determining whether the failure is material. . . . In giving weight to this factor courts have often used such less precise terms as "wilful." Adherence to the standards stated in Subsection (e) is not conclusive, since other circumstances may cause a failure to be material in spite of such adherence. Nor is non-adherence conclusive, and other circumstances may cause a failure not to be material in spite of such non-adherence.
Restatement (Second), supra, § 241, comment (f). Thus, while significant, lack of good faith is not conclusive in determining substantial performance. As the court illuminated in Vincenzi v. Cerro,
discussed above, fault on the contractor's part in not completing the contract is one of the factors entering into the equation of good faith.186 Conn. 615-16.
The parties' positions on the question of good faith are diametrically opposed. The defendants contend that the plaintiff attempted to assemble the building in a way that concealed the existence of gaps between the modules. They make three factual claims to support this allegation:
 • The plaintiff filled the exterior gap between the C and D modules by placing foam and a vertical wood strip on the outside wall.
 • The plaintiff installed the C and D boxes without installing fire stopping between the A and B CT Page 4339 boxes in the ceiling of the first floor; and
 • The plaintiff laid flooring in the attic that covered the gap between the C and D modules there.
The court will consider each of these claims in turn.
1. Foam and wood strip placed over the exterior gap between the C and Dmodules
The defendants' first claim of attempted concealment is that the plaintiff placed the foam and wood strip over the exterior gap between the C and D modules to conceal those gaps from them. Carlson testified at trial that he put them there to prevent additional water damage to the house,[24] and that he believed and intended that the manufacturer would fill this gap, a claim the defendants dispute. They reply that if Carlson had actually intended to request the manufacturer to fill this gap:
 there would be no need to install these materials in the gap. . . . The only rational inference . . . is that Carmel never intended to close the gap. By installing a cosmetic fix the gap was no longer visible from the outside. This concealed the existence of the gap but did nothing to fix the defect. A casual or uninformed consumer would assume that by filling in the gap, the problem was fixed.
(Defs.' Post Trial Br. at 33.) When the plaintiff installed the foam and wood strip, however, the defendants already knew about the gap between the exterior walls and between the interior center of the C and D boxes. Carlson's testimony that the purpose of the foam and wood strip was a temporary fix to prevent water from getting into the house is credible, particularly since there is testimony that it had rained the day after the modules were delivered, there was already water damage on some of the sheet rock, and the defendants had earlier complained about that water damage. The court thus finds that the purpose of the foam and wood strip was not to conceal the exterior gap. The evidence also established that the manufacturer in fact remedied these gaps.
2. Concealing the interior gaps between modules
The defendants' two remaining contentions of intentional concealment are similar in scope and effect. Placing the upper modules on top of the lower modules hid both the gap and lack of fire stopping between the lower boxes. Installing the attic floors could conceal the gap between CT Page 4340 the upper modules. The court will thus consider these two claims together.
The court finds it troubling that the plaintiff stacked the C and D boxes on top of the A and B boxes without placing fire stopping in the gap between the two lower modules. Doing so obscured both the gap itself and the lack of fire stopping. Carlson was on site for the set of the modules. The videotape made by the defendant Heather Bednar shows him to be actively involved and in charge of the set process — from which the court concludes that he was aware of the gap and approved the decision not to install fire stopping before setting the upper modules. The gap between the two boxes was plainly visible, and the court finds that Carlson could not have been unaware of it or that it exceeded one-eighth of an inch. Carlson himself testified that the best time to install fire stopping in such a gap between lower modules is before placing the top modules on the foundation, and that the lack of fire stopping in such a gap is a dangerous fire hazard. He offered no explanation for why he did not install fire stopping at the time. The court thus finds it reasonable to infer that the plaintiff intentionally decided, during the set process, to conceal the gap and lack of fire stopping between the A and B modules.
This effort, however, was completely and virtually immediately unsuccessful. Although installing the C and D boxes covered the gap between the A and B boxes, there is no evidence that the attic flooring completely concealed the gaps in the attic or that the plaintiff secured the attic floor boards so that they could not be lifted up. By the time the C and D boxes had been set onto the foundation, the problems with assembling the house had become obvious to all. The gaps were prominent, visible, and noticeable to all at the time. Placing the flooring on the attic floor could not conceal the gap in the attic from anyone, as it was immediately and obviously visible to all the parties. Ms. Bednar, for example, testified that a large gap between the two top boxes was visible from the outside and that "you could see a big space where the boxes didn't come together." (Test. 2/8/00 at 24.) She said that this gap between the C and D boxes was even more noticeable from inside the attic:
Question: Did you see this gap, at all from the outside?
 Answer: You could see some of it from the outside, but it wasn't as evident as when I went up into the attic. . . .
. . . . CT Page 4341
Question: And how far down could you see through the gap?
 Answer: I could see the workers all the way into the basement.
(Id., 26, 29.)
Ms. Bednar was, moreover, on site videotaping portions the assembly of the house and the subsequent repairs made by the manufacturer. The videotape recording, played by the parties at trial, shows prominent, visible gaps between the A and B boxes and the C and D boxes that were easily discernable along the exterior walls after the crane set all four modules on the foundation. The videotape recording and photographs introduced into evidence also clearly depicted the gap between the modules as viewed from the attic.
Thus, although the court concludes that the plaintiff initially attempted to conceal the first floor ceiling gaps, it does not make the same conclusion as to the second floor gap. By the time the crane had set the C and D modules on the foundation, concealing the gaps between these modules would have been impossible, and the court does not find any evidence that the plaintiff did so. Ms. Bednar even testified that on the evening of the first day of assembly "we stood in the basement and we just shone the [flash]lights up all the way through the attic, and looked." (Test. 2/8/00 at 32.) Thus, by the end of the first day of installation, the defendants were fully aware of both gaps — the one between the top of the A and B modules that was initially concealed by installation of the C and D modules, and the one between the C and D modules.
The testimony established that the Connecticut State Building Code, adopted pursuant to the mandate of § 29-252 of the General Statutes, requires fire stopping in gaps between modules of more than one-eighth inch.[25] Although quickly proving abortive, the plaintiff's initial attempt to conceal the lack of fire stopping in the gaps between the A and B boxes, by placing the C and D boxes atop them, evinces a willingness to expose the defendants and their minor children to this fire hazard and thus demonstrates a serious lack of good faith. The plaintiff acknowledged at trial that lack of fire stopping in such gaps was a fire hazard and that the easiest and least expensive time to install fire stopping is at the time of original assembly, before other modules impede access to the locations needing fire stopping. If the plaintiff had really intended to fire stop the first floor ceiling gap, it would have done so at the time of initial installation, before the C and D boxes had been laid on top. CT Page 4342
After the first day of assembly, the plaintiff contacted the manufacturer, reported numerous defects, and enlisted the manufacturer to send a work crew to the defendants' property.[26] As a result, all of the defects were eventually rectified. The defendants themselves complained to the manufacturer about the fire safety hazard that the gaps posed. By the time the plaintiff left the job, the manufacturer was on the work site; and the defendants and the manufacturer both knew that a gap ran between the modules from the basement to the attic. At that point, it was reasonable for the plaintiff to have assumed that the manufacturer would take care of the gaps, and that the defendants could protect their own self-interest. The defendants had consulted the local building inspector for advice on how to handle the problems they were having with the house. They had consulted a structural engineer for the same purpose, and the manufacturer agreed to reimburse the defendants for such an expense. The defendants and the plaintiff both relied on the manufacturer to fire stop the gap between the modules in the first floor ceiling. Why the manufacturer did not do so, when it did fire stop those same modules in the basement and the C and D modules in the attic, is a mystery that the evidence simply does not explain.
Although Carlson testified that he monitored the progress of the manufacturer toward addressing the defendants' complaints, there is no evidence of what the manufacturer said to the plaintiff about its fire stopping of gaps between the modules. There is no evidence, moreover, that the plaintiff actually knew, until the time of trial, that the manufacturer did not fire stop that gap or that the defendants faced such a fire hazard for the year they lived in the modular home before the gap was fire stopped.
On balance, after evaluating all the factors here, the court concludes that the plaintiff's short-lived and abortive effort to assemble the components of the modular house in such a manner as to conceal the gaps between the bottom two modules should not preclude recovery on the mechanic's lien for substantial performance. Although a serious breach of the plaintiff's duty of good faith and fair dealing, it caused no actual harm to the defendants here and has been completely repaired. The court thus finds that plaintiff substantially completed and performed its obligations under the purchase agreement. The plaintiff provided goods and services worth almost one hundred thousand dollars. There is no credible evidence, nor do the defendants claim, that the plaintiff was aware that the manufacturer did not fire-stop the gap between the lower modules during its trips to the work site in 1998 and 1999. The plaintiff and manufacturer rectified all the defects that the defendants complained about. The defendants expended a minimal sum of money to complete the plaintiff's obligations under the purchase agreement. In view of the substantial forfeiture to the plaintiff of a finding of material failure CT Page 4343 (i.e., not substantially performing), and the fact that the defendants can be adequately compensated otherwise for the incomplete performance and bad faith, and the other relevant factors, the court finds substantial performance. The plaintiff ultimately cured all known problems, the defendants were not harmed by the plaintiff's incomplete performance or bad faith, and the defendants have not been deprived of the benefit they reasonably expected.
D. The plaintiff substantially performed portions of the site workcontract.
Applying the criteria for a divisible contract under Connecticut case law and the Restatement (Second), Contracts, supra, § 240, to the site work agreement, the court finds that this agreement is itself severable and divisible. First, it is possible to apportion the performance of the separate tasks into corresponding pairs of part performance. The site work contract called for the plaintiff to pour foundation walls and floors for the house and garage, with separate prices of $10,325 for the house and $3,000 for the garage; to install a boiler and hot water heating system for $5,350; and to finish plumbing and electrical connections for $2,275 and $2,850 respectively.
Second, each pair of performances meets the test of "agreed equivalents." Each contract item had a contract price of "roughly equivalent value" to the defendants in terms of their overall expectations with respect to that agreement. For example, the plaintiff's total contract price for pouring the two foundations was $13,325; the invoice gave the defendants a credit of $3,000 for the plaintiff not having poured the floors of either before he left the work site. That amount fairly and roughly corresponds to the amount of $2,710.53 that the defendants later paid for concrete materials and labor to pour the basement and garage floors. Furthermore, the contract not only contained a separate charge for each obligation the plaintiff undertook in the site work contract, but included several jobs for which the plaintiff was not assuming responsibility. What the defendants would pay for each obligation represented a roughly equivalent value of the work to be performed under that agreement. Moreover, the defendants here were able to make full use of the incomplete performance by the plaintiff here — taking into account, as the comment to the Restatement suggests, the relative ease they had with which hired someone to finish pouring the concrete floors for approximately the same amount of money that the plaintiff offered as a credit for not having done that work.
The evidence does not establish that the plaintiff substantially performed its obligations to do the plumbing or electrical work[27] or to install the hot water heating system. The plaintiff's work pouring the CT Page 4344 concrete walls for the house foundation and garage, however, satisfies the requirements of substantial performance for that work. The defendants were not deprived of the benefit reasonably expected from the pouring of foundation walls; were able to obtain substitute performance of the balance of the foundation job for a reasonably comparable price; and can be adequately compensated through an offset or award of damages for the deficiency of performance. Further, there is no proof of lack of good faith and fair dealing on the plaintiff's part with respect to completion of this work. Not finding substantial performance would work a significant forfeiture on the plaintiff for its expenditure of funds and labor.
E. Valuing the work substantially performed
The contractual price of the purchase agreement, as supplemented by the specifications and options elected and modified by the change order, amounted to $92,198.18. The plaintiff substantially completed that work. The plaintiff also purchased and installed lolly columns under an oral agreement with the defendants at a cost to the plaintiff of three hundred dollars. Valuing the work substantially performed requires the court to deduct the cost of the additional siding the plaintiffs purchased and the cost of installing the siding. The court accepts as credible Heather Bednar's testimony that the defendants paid $1,400 to install the siding and $133.56 for basement windows. There is no evidence as to the cost of additional siding they had to buy. The court will address later the question of the value of the defendants' own labor that the defendants put into completing the work on the house.
The court also finds that the plaintiff substantially performed its obligation under the Site Work Proposal to pour the concrete foundations for the house and garage, for which that agreement placed a value of $13,325. The court finds that $3,000, the amount that the plaintiff's invoice credited the defendants for not having poured the floors, represents a fair value for the unfinished work of pouring the floors for the basement and garage foundations; this amount is equivalent to the $2,710.53 that the defendants paid for concrete materials and labor to pour the basement and garage floors plus the standard ten per cent profit margin that Carlson testified he would seek on such contracted work.
F. The defendants' special defenses
None of the defendants' special defenses defeat the plaintiff's claim of substantial performance. The court has already concluded that claims raised by two of the special defenses — breach of contract[28]
and compliance with building code[29] — do not prevent a finding of substantial performance — in particular, The other special CT Page 4345 defenses are discussed below.
1. Effect of the liquidated damages clause
The defendants claim that the liquidated damages clause of the purchase agreement is unenforceable under Connecticut law. Although the paragraph eight of the revised complaint alleges that the defendants agreed to pay $750 per day for expenses and costs, the plaintiff's claims for damages in its brief do not include this amount. As the plaintiff has therefore not pursued any damages under this clause in its brief, the issue is deemed waived. Zeigler v. Town of Thomaston, 43 Conn. Sup. 373, 378,654 A.2d 392 (1994), aff'd, 232 Conn. 270, 654 A.2d 352 (1995). Accordingly, this special defense is moot and the court need not address it.
2. Failure to assemble in a workmanlike manner
The defendants claim that "the workmanship utilized in the assembly of the modular home was not done in a workmanlike manner, in violation of the construction contract." (Defs.' Special Defenses ¶ 2.) The evidence as to the fault for the defects in the modular home was decidedly mixed.[30] The court finds that faulty construction by the manufacturer rather than improper assembly by the plaintiff caused a number of the problems complained about — such as absence of the wind barrier, the marred bathtub, misalignment of the basement stairway, and the improperly located kitchen ceiling lights. But these problems are all relatively minor. As for the two major problems, the misalignment of the exterior wall and the gaps between the modules, the court is unable to determine, from all the facts and circumstances here, whether faulty construction by the manufacturer or defective assembly by the plaintiff caused the building overhang and the gaps. The evidence does not permit a reasonable conclusion, by a preponderance of the evidence, as to who was responsible for the inability of the plaintiff's work crew to set the boxes so that there was no gap between the modules.
Thus the evidence does not sustain a finding by a preponderance of the evidence that any failure by the plaintiff to assemble the modular home in a workmanlike manner caused the gaps and misaligned exterior wall. The plaintiff's failure to fire stop the gap between the top of the A and B boxes, however, did breach its contractual promise of workmanlike performance. Yet such a breach of the promise of workmanlike performance, like the other aspects of incomplete performance, does not, as a matter of law, preclude a finding of substantial performance. The court has already considered this breach in its factual determination of substantial performance and its application of the factors set forth by case law and the Restatement. Thus, the court concludes that the second CT Page 4346 special defense does not defeat the plaintiff's claim.
3. The second mechanic's lien
The fifth paragraph of the defendants' special defense alleges that the second mechanic's lien filed by the plaintiff encumbered their property "far in excess of the amount. . . . rightfully owed him."[31] The plaintiff here filed two mechanic's liens. The first, in the amount of $98,453.18, was filed on October 22, 1998. The second, for $110,628.18, was filed on January 20, 1999, 91 days after the plaintiff claimed that its work had ceased on October 21, 1998. Section 49-34 of the General Statutes expressly provides that "[a] mechanic's lien is not valid, unless the person performing the services or furnishing the materials, (1) within ninety days after he has ceased to do so, lodges . . ." such a lien. The second lien was thus filed late, a fact that even casual perusal of the lien on the land records would reveal. The second lien was, as a matter of law, untimely and void, facially invalid and legally ineffective. At trial, the plaintiff introduced credible evidence of having withdrawn the second mechanic's lien.
Moreover, it was also obvious, from the face of the two mechanic's liens, that each was filed to cover the same debt.[32] The court finds further, from the evidence, that the plaintiff filed this second lien because the first lien had not been of a sufficient amount to cover all of the work the plaintiff maintained it had done (Test. 1/5/00 at 58) — i.e., not to recover an additional $110,628.18, but to supplement the initial lien of $98,453.18 up to that amount because the first lien had omitted sums due to the plaintiff's subcontractors. The court thus finds that the statements in each lien were "made in good faith, with no intention to deceive or defraud" and the defendants have introduced no evidence to indicate that anyone was "deceived or misled to his injury thereby." Soule v. Borelli, 80 Conn. 392, 399, 68 A. 979 (1908).
The Connecticut Supreme Court, in First Constitution Bank v. HarborVillage Ltd Partnership, 230 Conn. 807, 646 A.2d 812 (1994), recognized that "the remedial purpose of mechanic's lien law is to furnish security for a contractor's labor and materials and that this beneficent purpose requires a generous construction. . . . [Thus,] [i]n accordance with this policy, [the] courts have been liberal in validating liens despite claimed errors on the face of the lien certificate where the mistake was made in good faith and no resulting prejudice was claimed." (Citations omitted; internal quotation marks omitted.) Id., 815-16. For instance, our Supreme Court has held that a misstatement of the amount due on the face of a lien certificate does not render the lien invalid. Morici v. Jarvie,137 Conn. 97, 100-01, 75 A.2d 47 (1950).[33]
CT Page 4347
Under these circumstances, the court finds no legal impediment, from the filing of the second, now withdrawn, mechanic's lien, to plaintiff's ability to foreclose the first mechanic's lien for substantial performance. The plaintiff's actions complied with the statutory mandates for a mechanic's lien.[34] The plaintiff furnished goods and services in erecting and assembling the defendant's modular home pursuant to a contract. The plaintiff filed a timely mechanic's lien describing that work. He filed a second lien trying to supplement the amount; but that lien was legally ineffective because filed late. He filed both in good faith trying to perfect his claim on the land.
Although the defendants allege that the second lien encumbered their property "far in excess" of amounts the plaintiff could rightfully claim to be owed him, they introduced no evidence that the existence of the second lien in fact affected them. They introduced no evidence to support the claim in their brief that the presence of the second lien actually "denied and deprived them of the existence of $110,628.18 of equity in their land during preparation for trial." (Defs.' Post Trial Br. at 25.) Evidence that a lending institution, for example, had declined a loan request could have established that the second lien had actual impact, despite its legal defects. To the extent that the defendants may have been harmed by the second lien, they could have filed a counterclaim or cross-complaint for damages; but they offered no evidence that the second lien harmed them at all. Without such harm the court can find no reason why amounts stated in the second, invalid lien would preclude recovery on the first lien.
 IV — THE DEFENDANTS' CROSS-COMPLAINT
The defendants' cross-complaint alleges breach of contract (first count); CUTPA violations for attempting to hide a dangerous fire hazard (second count), for not providing the required statutory modular home warranty (third count), and for a contract containing terms contrary to the statute (third count); and breach of statutory and contract warranties (fourth count).
A. First Count: Breach of Contract
The first count of the cross-complaint alleges that the plaintiff breached its contract. The court finds that the defendants have met their burden of proof on this claim in the following respects. The court has found that the plaintiff's substantially completed portions of the contracted work and did not substantially complete others.[35] The court has found that the plaintiff's work was not done in a workmanlike manner (Defs.' Cross-Compl., Count One, ¶ 10) with regard to its failure to ensure fire stopping in the gap between the top of the A and B CT Page 4348 boxes. The court has concluded that the defendants did not sustain their burden of proof to establish by a preponderance of the evidence that the plaintiff damaged the modular units during "partial assembly of the modular home." (Defs.' Cross-Compl., Count One, ¶ 11.) The court has also found that the plaintiff wrongfully walked off the job when it ceased work on October 22, 1998, after the defendants refused to pay a premature invoice.
The defendants have not, with one exception, met their burden of proving the fourteenth paragraph of the first count of their cross-complaint that the plaintiff failed and refused to remedy defects in the modular home of which it had been notified. (Defs.' Cross-Compl., Count One, ¶ 14.) The evidence establishes to the contrary — that the plaintiff arranged for the manufacturer to correct the problems initially identified and that when the plaintiff discovered that nails had not been placed in the ceiling of the first floor and that there was a gap there of more than one-eighth inch, the plaintiff also arranged for the manufacturer to rectify those problems. The defendants have proven, however, that the plaintiff failed to remedy the gap between the lower modules of the modular home until the conclusion of the evidence here.
In summary, then, the plaintiff unjustifiably breached the contract by not completing certain portions of the work to which it had agreed. As the court found in paragraph twenty-seven of the findings of fact in Section II above, because of the plaintiff's breach, the defendants were obliged to do a portion of that work themselves and incurred various expenses thereby.
B. Second Count: Unfair Trade Practice For Attempting to Hide a Dangerous Fire Hazard
The gravamen of the second count of the cross-complaint, brought under the Connecticut Unfair Trade Practices Act, General Statutes § 42-110a
et seq., is that the plaintiff "attempted to assemble the components in such a manner as to obscure" a gap between the modules that was not fire stopped. (Defs.' Cross-Compl., Count Two, ¶ 8.)
The evidence established, and the court has already found, that after assembly of the modular home, there were gaps of more than one-eighth inch between modules in the attic and in the ceiling of the first floor. Without fire stopping, these gaps would be a dangerous fire hazard. The manufacturer installed fire stopping in the attic gap in 1998, but not in the first floor ceiling gap until after the conclusion of evidence in the year 2000.
The court concluded earlier that initially the plaintiff intentionally CT Page 4349 attempted to conceal the gap between the A and B modules by setting the C and D modules on top of them. As the court noted earlier, however, concealing these gaps was impossible as they were noticeable on the exterior walls of the modular home. The defendants knew about the gaps almost immediately. There is no evidence that the plaintiff knew that the manufacturer did not repair this gap. There is no doubt, however, that the manufacturer's work crew did not fire stop this gap in October or November of 1998; that it remained there without fire stopping from October 1998 until after the close of evidence; that it was concealed by ceiling, walls, and floorboard; and that it was a dangerous fire safety hazard until fire-stopped.
The defendant's initial decision to conceal the gap without fire stopping was the original and efficient cause of the lack of fire-stopping that exposed the defendants and their children to dangerous fire code violations for more than a year. The plaintiff's reliance on the manufacturer to fire stop the gaps, moreover, does not completely vitiate its own responsibility for the gaps. When it left the job site, the plaintiff knew that the house contained gaps that, if not fire stopped, would pose a danger to the defendants and their family. By walking off the job without just cause, the plaintiff put itself in a position where it was unable to ensure that the gaps were fire stopped. The manufacturer's failure to cure this problem does not remove the plaintiff's own responsibility for its decision not to install the fire stopping and to abandon the job.
In determining whether acts constitute a CUTPA violation, the courts are guided by the three-pronged "cigarette rule" adopted by the Federal Trade Commission:
 (1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise — whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers [(competitors or other businessmen)].
Williams Ford, Inc. v. Hartford Courant Co., 232 Conn. 559, 591,657 A.2d 212 (1995). "All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." Hartford Electric Supply Co. v. Allen-BradleyCT Page 4350Co., 250 Conn. 334, 368, 736 A.2d 824 (1999). "[A] violation of CUTPA may be established by showing either an actual deceptive practice . . . or a practice amounting to a violation of public policy. . . ." Ancona v.Manafort Bros., Inc., 56 Conn. App. 701, 714, 746 A.2d 184, cert. denied. 252 Conn. 954, 746 A.2d 184 (2000).
In this instance, the existence of dangerous gaps without fire stopping, in violation of the State Building Code, meets the first criterion of violating established public policy. It offends common concepts of fairness, moreover, for a builder or contractor to build a residential home that contains known fire safety hazards. It is unethical and unscrupulous for a contractor to build a residential home with concealed defects that could lead to substantial injury or death of people living there, a potential that the lack of fire stopping presented here. The lack of fire stopping in the ceiling of the first floor is therefore grounds to find a CUTPA violation in this instance. The fact that the plaintiff relied on the manufacturer, after the defendants discovered the gap running from the basement to the attic, to cure this defect does not defeat the fact that the plaintiff is the original cause and a substantial factor of the lack of fire stopping in this gap.
Under CUTPA, a party must prove not only an unfair trade practice, however, but that it has suffered "ascertainable loss." "CUTPA is limited to [a]ny person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by section 42-110b . . ." (Brackets in original; internal quotation marks omitted.) Reader v. Cassarino, 51 Conn. App. 292,298, 721 A.2d 911 (1998). This requirement of an ascertainable loss has "a broader meaning than the term `damage.'" As a consequence, "[u]nder CUTPA, there is no need to allege or prove the amount of the ascertainable loss." (Brackets in original; citations omitted; internal quotation marks omitted; internal alterations omitted.) Beverly HillsConcepts, Inc. v. Schatz Schatz, Ribicoff Kotkin, 247 Conn. 48, 79,717 A.2d 724 (1998).
 Whenever a consumer has received something other than what he bargained for, he has suffered a loss of money or property. That loss is ascertainable if it is measurable even though the precise amount of the loss is not known. CUTPA is not designed to afford a remedy for trifles. In one sense the buyer has lost the purchase price of the item because he parted with his money reasonably expecting to receive a particular item or service. When the product fails to measure up, the consumer has been injured; he has suffered a loss. In another sense he has lost the benefits of the CT Page 4351 product which he was led to believe he had purchased. That the loss does not consist of a diminution in value is immaterial, although obviously such diminution would satisfy the statute.
Hinchliffe v. American Motors Corporation, 184 Conn. 607, 614, 440 A.2d 810
(1981).
Fortunately, the lack of fire stopping in the gap at the ceiling level, despite the grave danger it posed, did not result in any actual harm to the defendants. The manufacturer repaired this defect sometime "[a]fter the close of testimony in this case." (Joint Stipulation of Facts dated 6/19/00.) The defendants, their children, and other visitors or house guests thus lived in and used the house for many months with a fire hazard, at great risk to them, but without any actual harm occurring to anyone.
The fact that the plaintiff eventually cured the lack of fire stopping in the ceiling of the first floor of the defendants home, however, does not mean that the defendants are unable to prove "ascertainable loss." The evidence here establishes that the defendants were required to cause damage to the interior structure of their house, by cutting open holes in the first floor ceiling and wall and in the second floor wall to detect this defect. The joint stipulation of facts clarifies that the repair work carried out by Premier Homes after the close of evidence "did not include sheet rock patching, painting or other cosmetic work" that would have been necessary to close, patch, and paint the holes in the walls so that the walls and ceiling were fully repaired.
The court finds that the damage done to the walls to discover the lack of fire stopping or bolts at the ceiling of the first floor and any other sheet rock patching, painting, and other cosmetic work made necessary by the defendants' investigation or the repairs performed by the manufacturer after the close of evidence constitute "ascertainable loss" sufficient to establish a CUTPA violation, though there is no specific evidence offered as to the exact cost necessary to do this final patching and painting. Similarly, in Hinchliffe, our Supreme Court found that the consumer's loss in that case was "ascertainable if it is measurable even though the precise amount of the loss is not known." Hinchliffe v.American Motors Corp., supra, 184 Conn. 614. The court in Hinchliffe
determined that the CUTPA language requiring an "ascertainable loss" does not require proof of the specific amount of damages or the ascertainable loss. Here, the loss is ascertainable and measurable, even though the specific amount of time and money necessary to make the final repairs was not proven. The court therefore finds that the defendants have proven a CUTPA violation for the plaintiff's actions in concealing the lack of CT Page 4352 fire stopping in gaps at the ceiling level of the first floor modules.
C. Third Count: CUTPA Violations for Omitting and Violating StatutoryWarranty
Although the third count of the cross-complaint alleges two CUTPA violations relating to the warranty here — that the contract supplied by the plaintiff "did not contain" the warranty clauses required by § 21-86 of the General Statutes[36] in modular home sales and "contained terms contrary to statute" — the defendants appear to treat this as the same claim. The court finds that the defendants have met their burden of proof on this claim in the following respects.
There is no doubt that the manufacturer's warranty that Carlson said he originally gave to the defendants did not contain the terms required by § 21-86. Not until July 8, 1999, did the plaintiff provide the defendants with a warranty that complied with the statutory requirements. Although the defendants maintain that they never received their written copy of "The Premier Builders manufacturer's limited warranty," and the copy the plaintiff had in his files was the pink "customer" copy (as indicated on the bottom of the form, the white copy went to the manufacturer, the yellow copy to the builder, and the pink copy to the customer), the court finds, to the extent it matters, that the plaintiff did give the defendants a copy of the initial written warranty.[37]
The court need not consider whether failure to comply with the terms of the required statutory warranty is an unfair trade practice or CUTPA violation, however, because the defendants have not established any damages or ascertainable loss from the plaintiff's failure to provide the required warranty. It is true, as the defendants argue, citingHinchliffe, that "[w]henever a consumer has received something other than what he bargained for, he has suffered a loss of money or property."Hinchliffe v. American Motors Corp., supra, 184 Conn. 614. Yet the defendants do not demonstrate any applicability of this proposition to their CUTPA claim for failing to provide the statutory warranty.
Accordingly, the defendants fail to sustain their burden of proof on the third count for failure to prove any ascertainable harm resulting from the alleged CUTPA violation.
D. Fourth Count: Breach of Statutory and Contractual Warranty
The fourth count of the cross-complaint sounds in warranty — alleging that the defendants did not contain the warranty clauses required by § 21-86 (Defs.' Cross-Compl. Count Four, ¶ 7), as the CT Page 4353 court has already found, and breached the "explicit warranty" in the purchase agreement that "all material would be as specified and all work done in a workmanlike manner." (Defs.' Cross-Compl. Count Four, ¶ 8.) The court finds that the defendants have met their burden of proof on this claim in the following respects.
As noted in the court's discussion of the special defenses, the court has found that the plaintiff's work was not done in a workmanlike manner because of the failure to install fire stopping in the gap between the top of the A and B boxes before placing the C and D modules on the foundation. The defendants did not, however, sustain their claim that the plaintiff breached its contractual warranty to use "all material . . . as specified." Although initially the modules delivered to the defendants' property did not contain all the materials that the defendants ordered, the plaintiff and manufacturer rectified those problems.
Since the contract for the sale and assembly of the modular home failed to contain the terms required by § 21-86, the defendants have proven their claim in the seventh paragraph of the fourth count, and are entitled, under § 21-86 (2) to "the recovery of court costs and reasonable attorney's fees."
 V — DAMAGES AND OTHER RELIEF
A. Plaintiff's Claim for Foreclosure of Mechanics Lien
 1. The Amount of the Debt on the Mechanic's Lien
Insofar as recovery by the plaintiffs is concerned, "[t]he general rule in breach of contract cases is that the award of damages is designed to place the injured party, so far as can be done by money, in the same position as that which he would have been in had the contract been performed." Rejouis v. Greenwich Taxi, Inc., 57 Conn. App. 778, 784,750 A.2d 501, cert. denied, 254 Conn. 906, 755 A.2d 882 (2000); see alsoKevin Roche-John Dinkeloo Associates v. New Haven, 205 Conn. 741, 749,535 A.2d 1287 (1988). In computing the damages in a contract action for substantial performance, the measure of damages is the unpaid balance of the contract price minus the reasonable cost of completing the work, plus the reasonable value of the extra services, with interest. Masda RealtyCorp. v. Name Realty Corp., 151 Conn. 204, 209-09195 A.2d 559 (1963). As the purpose of a damages award is to make an injured party whole, the rule of damages for substantial performance is appropriate to apply in determining the value of that substantial performance for purposes of a foreclosure action on a mechanic's lien. The plaintiff substantially completed the contracted work under the purchase agreement, which, as supplemented by the specifications and options elected and modified by CT Page 4354 the change order, amounted to a sales price of $95,828.18.[38] The plaintiff also substantially completed that portion of the "Site Work Proposal" obliging him to pour concrete foundations for the house and garage for a price of $13,325. From that amount the defendants are entitled to the following credits for the reasonable cost of finishing the work:
 • $1,400 paid to the siding contractor for finishing work required of the plaintiff under the purchase agreement; and
 • $3,465 for the cost of a chimney instead of a power vent that was not delivered with the house;
 • The site work contract placed a value of $13,325 for pouring the concrete foundations for the house and garage. From that amount the defendants are entitled to a credit of $3,000 for the unfinished work of pouring the floors for the basement and garage foundations; and
 • $133.56 for a mason to install four basement windows.
The plaintiff is also entitled to payment of $300 for the extra cost of the lolly columns Carlson purchased for the defendants. The plaintiff also claimed certain other expenses at trial, such as the cost of transporting the modules from the factory to the work site, but the court finds these to be subsumed within the total price of the purchase agreement and therefore not properly added again into the plaintiff's expenses.
The defendants' total debt for services rendered and materials furnished for the work that the plaintiff substantially performed is therefore as follows:
Purchase Agreement Contract amount $95,828.18 Site work agreement amount for pouring foundation walls and floor in house and garage $13,325.00 Cost of lolly columns $300.00 Credit for cost of pouring concrete foundation floors ($3,000.00) Credit for defendants' payment to mason to install four basement windows ($133.56) Credit for defendants' payment to siding contractor ($1,400.00) Credit for cost of chimney to defendants ($3,465.00) Credit for amount pre-paid ($8,000.00)
CT Page 4355 TOTAL $93,454.62
2. Interest
 a. Contract Interest
The purchase agreement between the parties provided that "[a[ny amounts not paid on time according to the foregoing payment schedule will be subject to a carrying charge of 1 1/2 % per month, which has an annual percentage rate of 18% plus any applicable charges. [T]he buyer here by [sic] agrees to pay all costs of collection including reasonable attorney fees." (Pl.'s Ex. 2, p. 2.) The contract provision thus raises the obvious question as to the application of the contract language "paid on time according to the foregoing payment schedule." The purchase agreement obliged the defendants to make the third payment of $76,501.40 "on the day the house is set on the foundation and made weather tight, i.e., the roof covered and the gable end sheathing in place and a fourth payment of $500 "upon completion and Certificate of Occupancy." (Pl.'s Ex. 2.) Under the contractual terms, then, the third payment was not due until the set was complete. The logical implication of the contractual language is that contract interest for not paying this third installment would not begin to accrue until after payment became due. The testimony established that the set is not complete until all fire-stopping has been put in place. See footnote ten above. The evidence further established that the final fire-stopping was installed after the conclusion of evidence; only at that point was the set complete. In the supplementary hearing the parties may offer a stipulation as to the date the final fire-stopping was completed or either party may offer evidence on the question. The court will award contract interest at the rate of eighteen per cent from the date of the completion of fire-stopping for the bottom two modules.
b. Statutory Interest
The court exercises its discretion to award statutory interest under § 37-3a of the General Statutes. That statute entitles a party to recover statutory interest at the rate of ten per cent for "the detention of money after it becomes payable." Our courts have construed this statute for the court to determine "whether the detention of the money is or is not wrongful under the circumstances." (Internal quotation marks omitted.) Lawrence v. New Hampshire Ins. Co., 29 Conn. App. 484, 498,616 A.2d 806, cert. denied, 224 Conn. 923, 618 A.2d 528 (1992). The defendant, Heather Bednar, herself admitted at trial that the plaintiff was owed payment for the house. The question here is determining when that payment become due such that failure to pay thereafter constituted a wrongful detention of funds. "If the trial court determines that one party has wrongfully detained funds, it must next determine the date the CT Page 4356 wrongful detention began. Where the claim rests on a breach of contract, statutory interest accrues from the date the contract was breached." (Internal citations omitted.) Patron v. Konover, 35 Conn. App. 504, 517,646 A.2d 901, cert. denied, 231 Conn. 929, 648 A.2d 879 (1994). As discussed in the preceding section, under the contractual terms payment did not become owing until the set was complete. Since the plaintiff's cause of action lies not in contract, however, but in a mechanic's lien, the date of breach does not seem applicable here.
Common sense suggests that the date the defendant's detention of money became wrongful was when the plaintiff could be deemed to have substantially performed the contract. Prior to substantial performance, the plaintiff could not recover on the mechanic's lien; afterwards it could. In Vincenzi v. Cerro, supra, 186 Conn. 612, 442 A.2d 1352 (1982), the court sustained an award of prejudgment interest from the date the court determined that substantial performance had occurred (albeit, without fully addressing the question, since the defendants confessed error on the question). Similarly, in Coastal Plumbing-Heating v.Habetz, Superior Court, judicial district of Ansonia-Milford at Milford, Docket No. CV90-030922 (August 28, 1991, Fuller, J.) (4 Conn.L.Rptr 451), the trial court awarded prejudgment interest under § 37-3a from the date of substantial performance.
In this case, the court concludes that the plaintiff had substantially completed performance of its duties under the purchase agreement and site work agreement as of November 4, 1998, the date that the manufacturer's work crew completed its second round of work at the premises. The defendants' detention of plaintiff's money became wrongful as of that date. The court will therefore award statutory interest at the rate of ten per cent from then in the amount of 22,352.30, plus any amounts further accruing until the court's final decision . . .
3. Attorney's Fees
The court finds that a reasonable attorney's fee here for the plaintiff would be $14,018.19, or fifteen per cent of the amount due for substantial performance. The court directs the parties to brief and argue at the supplemental hearing, however, whether, in view of the court's other findings and conclusions, the court should instead follow the rule of Simonetti v. Lovermi, 15 Conn. App. 722, 726, 546 A.2d 331 (1988):
 We also note that the plaintiff's own breach precipitated the litigation in which the legal fees at issue were awarded. The plaintiff, because of its substantial performance, was entitled to recover the value of the materials and services supplied under the CT Page 4357 breached contract. It would be inequitable, however, to allow the party in default under the contract to recover attorney's fees after its own wilful breach led to the litigation for which the fees were incurred.
 4. Foreclosure of Mechanic's Lien
Whether to foreclose the debt due on the mechanic's lien will depend on the court's findings at the hearing to be held pursuant to the court's orders below.
B. Recovery to Defendant
 1. Damages for Breach of Contract
The defendants are entitled to recover the reasonable cost of completing the performance that the plaintiff had agreed to do. 3 Restatement (Second), Contracts, § 348(2)(b), p. 119-20 (1981).
 For a breach of a construction contract involving defective or unfinished construction, damages are measured by computing either (i) the reasonable cost of construction and completion in accordance with the contract, if this is possible and does not involve unreasonable economic waste; or (ii) the difference between the value that the product contracted for would have had and the value of the performance that has been received by the plaintiff, if construction and completion in accordance with the contract would involve unreasonable economic waste."
(Internal quotation marks omitted.) Levesque v. DM Builders, Inc.,170 Conn. 177, 181, 365 A.2d 1216 (1976). The defendants here incurred the following expenses in finishing the work that the plaintiff did not complete:[39]
Plumber to complete plumbing connections and install heating system $6,200.00 Electrician 221.00 Cement contractor to pour basement and garage floors 990.00 Cement materials 1,720.53 Mason to install four basement windows 133.56 Electrician to repair wiring problems 150.98 Siding contractor 1,400.00 Installation of chimney 3,465.00 CT Page 4358 Missed work of defendant John Bednar 4,680.00
TOTAL EXPENSES INCURRED $18,961.07
In calculating damages for nonperformance and breach of contract, the court must also take into consideration expenses avoided by the defendants.
 It is axiomatic that the sum of damages awarded as compensation in a breach of contract action should place the injured party in the same position as he would have been in had the contract been performed. . . . The injured party, however, is entitled to retain nothing in excess of that sum which compensates him for the loss of his bargain. Guarding against excessive compensation, the law of contract damages limits the injured party to damages based on his actual loss caused by the breach. . . . The concept of actual loss accounts for the possibility that the breach itself may result in a saving of some cost that the injured party would have incurred if he had had to perform. . . . In such circumstances, the amount of the cost saved will be credited in favor of the wrongdoer; . . . that is, subtracted from the loss . . . caused by the breach in calculating [the injured party's] damages. . . . It is on this ground that . . . when an owner receives a defective or incomplete building, any part of the price that is as yet unpaid is deducted from the cost of completion that is awarded to him. . . . Otherwise, the owner would be placed in a better position than full performance would have put him, thereby doubly compensating him for the injury occasioned by the breach.
(Brackets in original; citations omitted; internal quotation marks omitted.) Argentinis v. Gould, 219 Conn. 151, 157-58, 592 A.2d 378
(1991). Since the plaintiff did not undertake or substantially complete the following work, the defendants avoided the following expenses that the contracts imposed:
Electrical Hookups in site work contract $1,850.00 Plumbing Connections in site work contract 2,275.00 Hot water heating system contract 5,350.00
EXPENSES AVOIDED $9,475.00
Moreover, the court has already, in assessing the value of the plaintiff's substantial CT Page 4359
performance, deducted the defendants' expenses for the siding contractor, cement contractor and materials, and chimney installation, a total sum of $1,400 + $990 + $1720.53 + $3465 = $7575.63, against the original contract charges in determining the amount the defendants owe for the plaintiff's substantial performance. Awarding these expenses to the defendants as damages would result in a double recovery. As the court held in Argentinis v. Gould, supra, 219 Conn. 151, the award of damages for breach of contract, in cases involving substantial performance, must be offset by costs saved. Had the defendants paid the plaintiff for these expenses, they would have been entitled to recover them; since they did not do so here, they are not a proper element for an award of damages. The court thus finds that the defendants suffered damages in the amount of expenses incurred ($18,961.07) less expenses offset against the contractual amount in determining value of substantial performance ($7,575.63) less expenses avoided ($9,475.00) = $1,910.44.
2. Damages and other relief for Second Count — CUTPA
Although the defendants showed that they had sustained "ascertainable loss" from the CUTPA violation of concealing a dangerous defect, they did not prove the amount of harm or damage they suffered, or the time or expenses they incurred in repairing and re-patching the holes in the walls and ceiling that they opened up. Accordingly, for purposes of damages, the court will award nominal damages of one hundred dollars.
The court enters an order for the recovery of court costs and an award of a reasonable attorney's fees pursuant to § 42-110g (d) of the General Statutes, which allows the court to award "costs and reasonable attorneys' fees based on the work reasonably performed by an attorney and not on the amount of recovery." The court orders the defendants to submit an affidavit concerning the hours spent in pursuing the CUTPA claim (including the attorney's fee and punitive damages claims), the rate claimed as the hourly rate for the attorney's fee, and the basis they would claim that rate to be a reasonable attorney's fee. After submission of that affidavit, the court will schedule a hearing for the parties to present evidence and arguments on this question.
Section 42-110g (a) also provides that "[t]he court may, in its discretion, award punitive damages . . . as it deems necessary or proper." Although common law punitive damages are limited in Connecticut to "the plaintiff's expenses of litigation, less his taxable costs";Berry v. Loiseau, 223 Conn. 786, 832, 614 A.2d 414 (1992); that rule does not apply under CUTPA. Under CUTPA, "punitive damages are available when there is evidence of a reckless indifference to the rights of others or an intentional and wanton violation of those rights . . . (Internal CT Page 4360 quotation marks omitted.) Staehle v. Michael's Garage, Inc.,35 Conn. App. 455, 462-63, 646 A.2d 888 (1994), quoting Gargano v.Heyman, 203 Conn. 616, 622, 525 A.2d 1343 (1987). The court finds that the plaintiff's action in initially concealing the gap in the first floor ceiling without installing fire stopping constitutes just such reckless indifference to the rights of others and poses such a risk of substantial harm to the consumer as to warrant an award of punitive damages. The defendants' discovery of the gap and the manufacturer's later failure to fire stop the gap may mitigate the consequences of the plaintiff's actions, but do not cancel or negate the plaintiff's own culpability for its decision to conceal the gap without fire stopping.
The parties may address the measure for determining punitive damages, the amount thereof, and the purpose they should serve in the supplemental briefing and hearing.
3. Damages and other relief for Fourth Count — Warranty
As the defendants suffered no actual harm from the plaintiff's failure to provide a manufacturer's warranty complying with § 21-86 or for the plaintiff's breach of its contractual warranty of workmanlike performance, the court will award nominal damages on this count for each of these violations of one hundred dollars. The court also enters an order for the recovery of court costs and reasonable attorney's fees pursuant to § 21-86 (2) for pursuing their claim under that statute. Just as with the similar awards under the second count, the defendants shall submit an affidavit concerning the hours spent in pursuing this claim and the basis they would claim for an hourly rate for a reasonable attorney's fee. After submission of that affidavit, the court will schedule a hearing for the parties to present arguments on this question.
 VI — FINAL ORDERS
Following receipt of this decision, the defendants shall submit an affidavit concerning attorney's fees as specified above, the parties may submit such exhibits they may wish the court to consider on the question of a hourly rate for a reasonable attorney's fee to pursue the CUTPA and statutory warranty claims, and either party may submit any legal memoranda or other exhibits they wish the court to consider with regard to attorney's fees for the plaintiff and punitive damages, as indicated above. The court will then schedule a hearing to consider any affidavit or evidence regarding the date the final fire-stopping was installed; review any evidence concerning attorney's fees; determine and update interest to the date of judgment; consider claims regarding punitive damages; determine whether to award offer of judgment interest; consider CT Page 4361 the effect of the court's present and subsequent decisions on issuance of a judgment of foreclosure and other orders ancillary to issuance of a judgment of foreclosure; and make other determinations required by this decision. The parties should confer with the clerk to arrange a briefing and hearing schedule. A week prior to any hearing the parties shall exchange copies of any evidentiary exhibits they intend to offer, the names of witnesses they intend to call, and written summaries of the intended testimony.
SO ORDERED.
BY THE COURT
STEPHEN F. FRAZZINI JUDGE OF THE SUPERIOR COURT